

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00133-CR

———————————————

ISAIAH EMMANUEL GUERRA, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. DC78-CR2020-0583

Before Birdwell, Womack, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Isaiah Emmanuel Guerra entered into a plea bargain and pleaded guilty to two offenses—possession of a controlled substance and money laundering. *See* Tex. Health & Safety Code Ann. §§ 481.103(a)(1) (listing tetrahydrocannabinol (THC) as a Penalty Group 2 controlled substance), 481.116(d) (possession of a Penalty Group 2 controlled substance); Tex. Penal Code Ann. § 34.02 (money laundering). The trial court placed Guerra on deferred adjudication community supervision for seven years, assessed a $1,000 fine, and granted him permission to appeal the denial of his pretrial motion to suppress. *See* Tex. R. App. P. 25.2(a)(2)(A), (B).

At the suppression hearing, the evidence showed that the police stopped Guerra's vehicle for speeding. Guerra does not dispute that the initial stop was proper. While investigating the speeding infraction, however, one of the officers purportedly smelled marijuana. Without consent and without a warrant, the officers then searched Guerra's vehicle and found THC[1] products and a large amount of U.S. currency.

---

[1]"THC is the main psychoactive compound in cannabis that produces a 'high' sensation. It can be consumed by smoking cannabis. It's also available in oils, edibles, tinctures, capsules, and more." Healthline, *CBD vs. THC: What's the Difference?*, https://www.healthline.com/health/cbd-vs-thc (last visited Sept. 29, 2023).

Based on the testimony, the police apparently found "THC wax." THC wax is a marijuana concentrate. A marijuana concentrate such as THC wax is a highly potent concentrated form of THC that can range from 40 to 80 percent. *See* Drug

On appeal, Guerra contends that by denying his motion to suppress, the trial court erred because (1) the detention period was not reasonable and (2) the Texas legislature made hemp and other cannabis products legal, so "the officers had no way to determine or distinguish whether the odor they may have detected was of a legal or illegal substance." We hold that the trial court did not err by denying Guerra's motion to suppress because the detention period was not unreasonable and because the statute on which Guerra relies did not become effective until after his stop. We overrule Guerra's two points and affirm the trial court's judgment.

## II. SUPPRESSION

In Guerra's first point, he contends that his detention was unreasonably prolonged because the patrol officer had already written the traffic warning when he effectively began his drug inquiry. Thus, Guerra argues, the trial court erred by denying the motion to suppress. We disagree.

### A. Background

#### 1. The Motion to Suppress

In the motion to suppress, Guerra asserted, among other arguments, that the "search of [his] truck [by Deputy Justin Mitchell and Deputy Gabriel Villarreal] was void and illegal because it was based on false facts and circumstances, false probable cause[,] and a prolonged detention."

Enforcement Administration, *Vaping & Marijuana Concentrates*, https://www.dea.gov/sites/default/files/2020-06/Vaping%20and%20Marijuana%20 Concentrates-2020.pdf (last visited Sept. 29, 2023).

3

**2.** **The Dashcam Video Appears to Superficially Support Guerra's Argument**

On Mitchell's dashcam video, Mitchell does not appear to inquire about any drugs until very late in the detention, which, on the surface, appears to support Guerra's contention that the traffic investigation was over when Mitchell initiated his drug investigation. Because Guerra complains about the detention's length, we rely on the video to provide a chronological framework:

- 0:55 Guerra stops his pickup on the shoulder.[2]

- 1:15 Mitchell arrived at the passenger window, asked how the two occupants were doing, and promptly followed up by requesting their driver's licenses. Mitchell asked if the pickup was theirs; the occupants' responses were not audible, but his next question was whether they had insurance. For the most part, Mitchell stood a short distance from the window, but on a couple of occasions, he put his face very close to the passenger window.

- 1:35 Mitchell asked if the occupants were on vacation. (Guerra's pickup had Oregon license plates.) Although the occupants' voices were not audible, Mitchell could be heard saying Pasadena.[3]

---

[2]Guerra could have pulled onto a turnoff but, instead, drove past the turnoff by a few feet and parked on the shoulder very close to the outside lane of traffic, making it dangerous for Mitchell to approach the pickup on the driver's side. Mitchell avoided this danger by approaching Guerra's pickup from the passenger side, where there was still plenty of shoulder available. We note this because consciously or unconsciously, Guerra appears to have unnecessarily made the stop as hazardous as possible for Mitchell. A rational factfinder might have reasonably concluded that this fact was not lost on Mitchell. The second officer who arrived at the scene, Villarreal, commented, "Depending on the traffic stop and the highway we're on and the amount of traffic, I usually make a passenger side approach . . . ."

[3]Because Guerra was headed northbound, the reference to Pasadena would appear to be to Pasadena, Texas. We take judicial notice that Pasadena, Texas, is

4

- 1:55 Mitchell asserted that the speed limit was 60 miles per hour (mph).

- 2:05 Mitchell informed the occupants that he was not going to write a ticket.

- 2:20 Mitchell asked the occupants if they lived in Oregon, but their responses were not audible; apparently responding to the occupants' answer, Mitchell questioned whether they had just moved to Texas.

- 2:40 Mitchell instructed Guerra to go back to his patrol car where Mitchell would write up a warning; Mitchell further advised Guerra to be careful when he stepped out of his pickup. Guerra complied and proceeded to sit down in the patrol car's front passenger seat. Guerra appeared very young.[4]

- 3:50 Inside the patrol car, when Mitchell asked where Guerra was going, he responded that he was headed to an RV camp to join his family, but when Mitchell asked where the RV camp was, Guerra responded that he did not know and that he was just following his GPS. Mitchell followed up by asking Guerra where his RV was because none was attached to Guerra's pickup.

- 4:20 Mitchell then asked Guerra what kind of RV his family had, but Guerra could not answer and eventually suggested that they had a mobile home.

- 7:05 When Mitchell asked whether Guerra's family had given him an address, he responded that they had not.

- 9:00 When Mitchell asked Guerra what year his pickup was, Guerra also could not answer.

- 9:40 On the video, Villarreal appeared as he walked toward the pickup's passenger window.

---

located near Houston and the Gulf Coast. *See* Tex. R. Evid. 201(b)(2); Google Maps, https://www.google.com/maps/place/Pasadena,+TX (last visited Sept. 28, 2023).

[4]The indictment shows that Guerra was 19 in May 2019.

- 9:53 Villarreal put his head near the window.

- 10:05 Villarreal put his head inside the window.

- 11:10 Villarreal appeared at Mitchell's passenger window, stated that the pickup's other occupant was a "butthead," and attempted—without much success—to engage Guerra in a conversation. Commenting on Villarreal's lack of success, Mitchell said that he and Guerra had been talking, so Guerra's and his companion's reluctance to talk to Villarreal must have had something to do with Villarreal. Sharing information that Mitchell had gained from Guerra, Mitchell informed Villarreal that Guerra and his friend were coming from Pasadena. At that point, Villarreal asked Mitchell a follow-up question, which was whether Guerra at least knew where they were going. Mitchell responded, "He don't know."

- 12:45 Mitchell communicated with dispatch and provided the Texas driver's license numbers for Guerra and his passenger, Brian Sosa.

- 14:00 After getting the results, Mitchell commented that Sosa had numerous tickets and opined that the tickets might have explained Sosa's "butthead" behavior.

- 15:25 Mitchell asked Guerra for help pronouncing Sosa's father's name, but Guerra was not able to help.

- 17:00 Mitchell asked Guerra if he had anything illegal in the pickup, and Guerra responded that he was just driving.

- 18:40 Mitchell asked Guerra if he could search his pickup; Guerra did not respond. Mitchell followed up by stating that his partner had a K9 and that the K9 was going to walk around his pickup. Not long afterwards, the officers asked Sosa to step out of the pickup.

- 20:00 Mitchell and Villarreal began their search.

6

### 3. Deputy Mitchell Initially Saw Reasonable Suspicion to Prolong the Detention; Later He Saw Probable Cause to Search the Pickup

Deputy Mitchell testified that he was assigned to the Criminal Interdiction Unit and that he patrolled the major roadways in Wichita County, i.e., Highway 287 and Interstate 44. Highway 287, Mitchell said, had a lot of drug traffic. As a member of the Criminal Interdiction Unit, Mitchell said that almost all his duties involved narcotics and finding narcotics on the roadways.

During the evening of May 8, 2019, while Mitchell was parked on the Highway 287 median, he noticed an F-150 pickup speeding northbound. The pickup was going 64 mph in a 60-mph zone. Mitchell said that he pulled the pickup over, approached the passenger window, and made contact with the pickup's occupants, one of which was Guerra. Another man, Sosa, was on the pickup's passenger side. Both men provided Mitchell with a driver's license. Mitchell acknowledged that he had not smelled anything that concerned him. Mitchell asserted that he informed Guerra why he had stopped him and asked Guerra to come back to his patrol car while Mitchell prepared a written warning.

Mitchell asserted that while he was at the pickup's window, Guerra had said that they were going on a trip and that they had travelled from Pasadena and were headed to Amarillo. Guerra also said that they were travelling to meet his family at an RV park, but Mitchell noted that no RV was attached to the pickup.

Mitchell opined that Guerra's answers in the patrol car were short and not very detailed. Mitchell said that while he was filling out the written warning, he also checked Guerra's and Sosa's driver's licenses through dispatch and received information about the pickup's Oregon license plate.

Villarreal assisted Mitchell with the stop. Villarreal initially contacted Sosa, who remained in the pickup, and then Villarreal came to Mitchell's patrol car, where Villarreal also spoke with Guerra. While viewing the video of the stop, Mitchell said that Villarreal came into view at 9:48 and that Villarreal "pretty much" put his head in the passenger window at about 10:09. At that point, the prosecutor fast-forwarded the video, and Mitchell said that at 16:29, you could hear Villarreal's voice because he was at Mitchell's passenger window. Eventually, Mitchell issued a warning to Guerra.

Mitchell asserted that at 17:11, he started asking Guerra about anything illegal in the pickup. Mitchell acknowledged that he did not begin questioning Guerra about narcotics and currency until after he wrote the warning. Mitchell also acknowledged that he did not smell any marijuana while Guerra was sitting inside his patrol car. Mitchell stated that he had asked Guerra about narcotics because Guerra was going northbound, which was the normal route for U.S. currency and drug transportation. Mitchell maintained that Guerra's hands and knees were shaking visibly and that Guerra gave very short, nonspecific answers, if he gave any answers at all. Mitchell related that he then asked Guerra for consent to search his vehicle, but Guerra did not answer. When Guerra did not respond, Mitchell "advised him that Deputy

8

Villarreal was there[,] . . . he had a . . . K9 with him, and . . . Deputy Villarreal would deploy his K9 in a free air sniff around the outside of the truck."

Villarreal, however, never deployed his K9. Mitchell explained that Villarreal had sent an instant-messenger-type communication on the in-car computer system that he had smelled marijuana inside the pickup. Mitchell said that for safety reasons, they did not want Guerra to know if one of them had smelled marijuana, so Villarreal communicated that information to Mitchell through the messaging system.

Mitchell asserted that marijuana had a distinct odor and that burnt and unburnt marijuana had different odors. Mitchell maintained that THC also had an odor. Mitchell maintained that the odor of marijuana can linger inside the cab of a vehicle and on people's clothing. He related that in his experience, drug smugglers tended to smoke or use drugs to calm their nerves.

According to Mitchell, he and Villarreal had probable cause to search Guerra's pickup.[5] For that conclusion, Mitchell relied on Villarreal's message that he had smelled marijuana, Guerra's nervousness, the out-of-state plates, and the fact that Highway 287 was a known drug corridor. Mitchell indicated that he and Villarreal began searching the vehicle around 20:30.

---

[5]Mitchell said that while questioning Guerra, he felt that he had reasonable suspicion to use Villarreal's K9, but deploying the K9 became unnecessary after he received Villarreal's message at around 19:10 that he had smelled marijuana.

Inside the pickup, Mitchell and Villarreal found several narcotic items and a large amount of U.S. currency. The narcotics, Mitchell said, were THC products.[6] Some of the THC products were in the cab of the pickup, and the rest were in suitcases located in the bed of the pickup.

In addressing the length of the detention, Mitchell denied that after he issued the warning, his investigation was over. Mitchell elaborated, "Because even if Deputy Villarreal had not smelled the odor of marijuana, I was still gonna request him to do the[ K9]." Mitchell and defense counsel engaged in the following exchange:

> [Defense counsel] Q. Okay. And, Officer, do you believe that you would have let Mr. Guerra go if it weren't for the fact of the message that you received from Officer Villarreal?
>
> A. No, sir.
>
> Q. Okay. So you were going to continue forward with your investigation no matter what?
>
> A. Correct.

Mitchell acknowledged that Guerra did not consent to the search and that Mitchell had not obtained a search warrant.

Defense counsel questioned whether the type of drugs that Guerra had been transporting emitted an odor:

---

[6]Guerra's motion to suppress identifies the controlled substance as marijuana wax. The judgment identifies the substance as "[THC] (4–400 Grams)," a second-degree felony. *See* Tex. Health & Safety Code Ann. §§ 481.103(a)(1) (placing THC under Penalty Group 2), 481.116(d) (possessing four grams or more but less than 400 grams of a Penalty Group 2 drug is a second-degree felony).

[Defense counsel] Q. What is the difference between THC and CBD?

A. Well, THC is the -- the chemical concentrate within marijuana, and CBD is minus the THC.

Q. Okay. Does CBD have a -- a distinct odor?

A. CBD?

Q. Yes.

A. I'm not sure.

Mitchell maintained that THC wax had the odor of marijuana.

**4. Sergeant Villarreal Determined He Had Probable Cause to Search the Pickup When He Smelled Marijuana Inside the Passenger Window**

Villarreal was a sergeant by the time of the hearing. As a patrol officer and as a sergeant, Villarreal had a K9 ride with him.

On the evening of May 8, 2019, he assisted Mitchell with a traffic stop. According to Villarreal, Mitchell was inside his patrol car when Villarreal pulled up. Villarreal said that his usual practice was to walk on the passenger side of the stopped vehicle and "make casual conversation" with any passengers. Villarreal said that he did that in this instance, and while talking to the passenger, he smelled marijuana. Villarreal described the sequence of events that led him to place his face inside the window:

[Prosecutor] Q. Were you able to -- Did the passenger talk to you at all?

A. No. No. He -- He didn't want to talk to me. So, at first, when I was asking him questions, I wasn't sure if I could hear him or he spoke English or maybe I wasn't being clear, so I kind of g[o]t closer to see if

11

his face [was] moving or something. And at that point, I determined he just didn't want to talk to me, so --

Q. We saw the video earlier of Deputy Mitchell's [dashcam,] and we see there's an instance where you peek your head in. Is that what you were doing?

A. Right. Yeah, because he -- he's leaned back in the truck, so I'm talking, not getting any answers, so I'm trying to kind of read his face, see what's going on.

Q. And, at that point, after you determined he wasn't going to talk to you, what did you do?

A. I just came back to Mitchell and started talking to them.

Villarreal asserted that, based on his experience, Highway 287 was a known drug corridor for drug trafficking. Villarreal then explained why the stop was unusual:

Q. Did you become suspicious of either the passenger or a combination of the passenger and Guerra's behaviors during your questioning?

A. Well, it wasn't -- You know, it wasn't common with as many traffic stops as we do for somebody not to speak to you. So at that point, it was -- it was weird. It was kind of odd.

Villarreal also explained that because both Guerra and Sosa were "kind of irritated," he did not want to make the situation worse than it was by letting Guerra know that he had smelled marijuana, so he communicated that information to Mitchell through their computers.

And as a peace officer, Villarreal said that he was trained to identify narcotics based on sight, smell, and texture. He maintained that he was familiar with the smell of burnt marijuana, unburnt marijuana, and THC wax. He said they all smelled about

12

the same.  Villarreal asserted that if someone had smoked marijuana earlier in the day in the vehicle, the smell would linger on clothing, skin, and hair.  The vehicle's cab too would retain the odor.

Villarreal also stated that he thought that THC and CBD had the same odor, so a lab would have to determine whether the police were dealing with one or the other. On cross-examination, defense counsel pinned Villarreal down on his assessment:

> [By defense counsel] Q. Okay.  So you're saying that there is no smell difference between CBD versus wax?
>
> A. Right.
>
> Q. Versus marijuana?
>
> A. Correct.
>
> Q. It's all three exactly the same?
>
> A. Yeah, if you get one leafy -- just marijuana and the leafy CBD, it has smell -- the same smell.

When defense counsel asked Villarreal why he could smell the marijuana and Mitchell could not, Villarreal responded that he and Mitchell had worked together about ten years.  Villarreal then elaborated:

> [Defense counsel] Q. Was it unusual that Deputy Mitchell couldn't smell anything, under his testimony, but you could?
>
> A. It's not unusual, actually.
>
> Q. Okay.  Can you explain why?
>
> A. Uh, he has . . . problems with his nose.  He's always got the crappiest allergies.  Because I work with the guy[,] and I see him almost

13

every day, so for him not to be able to smell one day, . . . it's nothing new to me. He just can't smell.

## 5. Deputy Mitchell (Recalled) Acknowledged Allergies

When recalled, Mitchell admitted having allergies. Mitchell did not recall whether his allergies were bothering him on the day that he stopped Guerra.

## 6. Dr. David Allen Disputed THC Wax Had Any Smell

Guerra called Dr. David Allen, a specialist in cannabis sciences, to testify on his behalf. Dr. Allen explained his background:

> A. Well, . . . they don't teach this science in medical school, . . . so I had to teach myself most of this stuff. I've written . . . probably about 30 articles regarding cannabis. I have a couple of cannabis inventions that are . . . mine, and I have . . . some innovative ideas about the cannabis science that are . . . strictly my hypotheses, I would say.

Dr. Allen then went on to contradict Mitchell's and Villarreal's testimony about the relative smells of marijuana, THC wax, and CBD:

> [Defense counsel] Q. Okay. Dr. Allen, . . . in a nutshell, does CBD smell like burnt or raw marijuana?
>
> A. No. They're completely different. . . .
>
> Q. Does THC wax, whether it's -- whether it's raw or whether it's mixed with tropical strawberry, smell like burnt or raw marijuana?
>
> A. No. . . . No one would even make that suggestion, that they smelled the same.
>
> Q. And if someone did make that suggestion, what would you say as far as their knowledge is concerned of CBD [sic] wax?

14

A. They probably have ulterior motives if they say that. Because anybody that has any experience with cannabis . . . will tell you that they're completely different, three different smells.

## 7. The Trial Court's Ruling

The trial court denied Guerra's motion to suppress.

## 8. The Trial Court's Conclusions of Law

The trial court filed written findings of fact and conclusions of law. Relevant

to this appeal, the trial court made the following conclusions:

15. Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence; reasonable suspicion requires only a minimal level of objective justification for the detention. *Furr v. State*, 499 S.W.3d 872, 878 (Tex. Crim. App. 2016).

16. Cumulative information known to cooperating officers at the time of a temporary detention is to be considered in determining whether reasonable suspicion exists for the detention. *Derichsweiler*[ *v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011).]

17. Based on the cumulative information known by Deputy Mitchell and Sergeant Villarreal, and based on the totality of the circumstances, by the time that Deputy Mitchell had completed his investigation and processing of the initial purpose of the traffic stop, speeding, the officers had reasonable suspicion of additional criminal activity, drug trafficking, to justify a continued investigative detention.

18. The lengths of the initial detention for speeding and of the continued reasonable-suspicion-based detention for the investigation of additional criminal activity were each reasonable in duration. The officers had reasonable suspicion for a continued detention independent of the initial speeding offense, and they acted to dispel their suspicions quickly.

19. Under the automobile exception to the Fourth Amendment's general requirement of a search warrant, an officer can conduct a warrantless search of a vehicle if the vehicle is readily mobile and if there is probable

cause to believe that it contains contraband. *Marcopoulos v. State*, 538 S.W.3d 596, 599 (Tex. Crim. App. 2017).

20. Probable cause exists when facts and circumstances known to law enforcement officers are sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed. *Id.* For probable cause to exist, there must be a fair probability of finding inculpatory evidence at the location being searched. *Id.*

21. The odor of marijuana alone may be sufficient to constitute probable cause to search a vehicle. *State v. Garza*, 526 S.W.3d 487, 489 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.) [(mem. op.)] (collecting cases); *Rocha v. State*, 464 S.W.3d 410, 418 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) [(op. on reh'g)].

22. Based on the credible testimony by Sergeant Villarreal that he smelled the odor of marijuana coming from the Ford [pickup] and based on all other circumstances shown by the credible testimony of Deputy Mitchell and Sergeant Villarreal, the officers had probable cause to conduct a warrantless search of the Ford.

## B. Standard of Review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). Because the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony, *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007), we defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor, *Martinez*, 570 S.W.3d at 281. Whether the totality of circumstances supports reasonable suspicion or probable cause is a legal

determination we review de novo.  *State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008).

When the trial court makes explicit fact findings, as the trial court did in this case, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings.  *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013).  We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling.  *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

## C.  Legal Principles

To prolong a traffic stop to investigate for illegal drug-related activity, officers need reasonable suspicion; to search the vehicle for illicit drugs, they need probable cause.  *See Furr*, 499 S.W.3d at 877.  As the Texas Court of Criminal Appeals explained,

> There are three distinct types of police–citizen interactions: (1) consensual encounters that do not implicate the Fourth Amendment; (2) investigative detentions that are Fourth Amendment seizures of limited scope and duration that must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures, that are reasonable only if supported by probable cause.

*Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013).  For example, in *Ramirez-Tamayo v. State*, the Texas Court of Criminal Appeals held that the deputy had reasonable suspicion of criminal drug activity to prolong the appellant's traffic-related detention for the purpose of having a narcotics-detection dog sniff the car's exterior.

17

537 S.W.3d 29, 38–39 (Tex. Crim. App. 2017) (holding that the combined logical force of the circumstances permitted a reasonable inference that the appellant was engaging in illegal activity—(1) the appellant was driving a rental car on an interstate highway with a possibly inoperable window that the deputy knew could be caused by the presence of illegal drugs hidden inside the door, (2) the appellant and his car presented unusually strong odors that could be used to conceal the scent of illegal drugs, and (3) the appellant was abnormally nervous during his contact with the deputy).

## D. Discussion

When Guerra exceeded the speed limit, Mitchell had all the justification he needed to stop Guerra. *See Walter v. State*, 28 S.W.3d 538, 540–42 (Tex. Crim. App. 2000) (addressing pretext stops). Guerra does not dispute the validity of the initial stop. Rather, Guerra contends that after the valid initial traffic stop and investigation ended, Mitchell improperly launched into a second investigation for drugs. Essentially Guerra argues that Mitchell did not possess reasonable suspicion of drug activity until after he had completed all activities related to the traffic stop.

It is fair to say that Mitchell's investigation of whether Guerra was speeding was effectively over the moment that he determined that Guerra was travelling 64 mph hour in a 60-mph zone. This is more-or-less confirmed in the video when—about one minute after Guerra had stopped his pickup—Mitchell informed Guerra

18

that he was not going to ticket him for speeding. The stop, however, was not over; Mitchell still had to fill out the warning form.

Nor was the investigation itself over. Beyond determining whether to issue a traffic ticket, an officer's duty includes ordinary inquiries incident to the traffic stop. *Rodriguez v. United States*, 575 U.S. 348, 355, 135 S. Ct. 1609, 1615 (2015). Typically, such inquiries involve checking the driver's license, determining whether the driver has any outstanding warrants, and inspecting the automobile's registration and proof of insurance. *Id.*; 135 S. Ct. at 1615. Mitchell still had to perform the inquiries incident to the traffic stop—such as checking the driver's licenses and the Oregon license plates.

Based on the video, from the outset, Mitchell appears to have been probing to determine whether Guerra was running drugs and currency. That was, after all, Mitchell's job. As a member of the Criminal Interdiction Unit, one of his duties was to find narcotics on the roadway. Provided the delay did not exceed the time needed to conduct the traffic stop, Mitchell was free to probe for more information regarding his other suspicions. *See id.* at 354, 135 S. Ct. at 1614.

A detention seizure remains lawful so long as unrelated inquiries do not measurably extend the stop's duration. *Id.* at 355, 135 S. Ct. at 1615. Even then, however, if the officer develops reasonable suspicion that the driver or an occupant of the vehicle is involved in criminal activity, the officer may continue questioning the

19

individual regardless of whether the official tasks of a traffic stop have come to an end. *Lerma v. State*, 543 S.W.3d 184, 191 (Tex. Crim. App. 2018).

Mitchell did not, however, investigate by inquiring about drugs; rather, he did so by determining whether Guerra had a nondrug-related explanation for travelling down a known drug corridor with Oregon license plates but with a Texas driver's license. Mitchell did this first while standing at the passenger window of the pickup and then while filling out the warning form in his patrol car. Mitchell asked questions that law-abiding persons could be expected to answer with ease. In contrast, Guerra did not find the questions so easy to answer.

Despite driving a pickup with Oregon license plates, both Guerra and Sosa gave Mitchell Texas driver's licenses. Guerra gave an explanation for the Oregon license plates, but Mitchell did not have to believe it. *See Wiede*, 214 S.W.3d at 24–25 (stating that the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony). Guerra could not say where he and Sosa were going other than to say that they were meeting his parents at a mobile home in an RV park at a location that his parents had not provided. A rational factfinder could have reasonably concluded that Mitchell was justified in not believing Guerra. *See Johnson*, 414 S.W.3d at 192 (stating that appellate courts view the evidence in the light most favorable to the trial court's ruling).

In instances involving cooperating officers, the cumulative information known to the officers is considered in determining whether reasonable suspicion exists. *Hoag*

*v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987). The detaining officer is not required to be personally aware of every fact that objectively supports reasonable suspicion. *See Derichsweiler*, 348 S.W.3d at 914. From the moment Villarreal stuck his head into the passenger window and smelled marijuana (around 10:05 on the video), Mitchell and Villarreal collectively had more than reasonable suspicion; they had probable cause to search the vehicle. *See Garza*, 526 S.W.3d at 489 (stating that Texas courts have held that the odor of marijuana alone is sufficient to constitute probable cause to search a defendant's person, vehicle, or objects within the vehicle).

About two and a half minutes after Villarreal had stuck his face inside the passenger window, i.e., around 12:45 on the video, Mitchell sent the driver's license information to dispatch. The investigation incident to the traffic stop was still in progress. Thus, Mitchell and Villarreal had probable cause to search the pickup before Mitchell had completed the investigation incident to the traffic stop.

At about 17:00, Mitchell asked Guerra if he had anything illegal in the pickup. Based on the testimony, this is the point by which the investigation incident to the traffic stop had been completed. This point is well beyond the moment Mitchell and Villarreal had probable cause.

Mitchell said that around 19:10, Villarreal made him aware that Villarreal had smelled marijuana. But from Mitchell's perspective, the only significance of that information was to moot the necessity of a K9 search.

21

Thus, before Mitchell had completed the traffic-violation investigation (around 17:00), Mitchell and Villarreal collectively had probable cause to search Guerra's pickup.

The testimony regarding whether Villarreal could have smelled the THC wax was disputed. For our purposes, the trial court believed Villarreal. In its findings of fact, the trial court noted that Villarreal knew the odor of smoked marijuana and that Mitchell asserted that drug runners often used drugs, such as marijuana, to calm their nerves. Consequently, the trial court did not necessarily have to disbelieve Dr. Allen's assertion that THC wax had no scent; rather, the trial court could have believed Villarreal's claim that he smelled marijuana inside the pickup's cab based on Guerra's, Sosa's, or both Guerra's and Sosa's having smoked marijuana earlier during their trip.

Guerra argues that the trial court should not have believed Villarreal's testimony because Mitchell failed to smell any marijuana—in the pickup or on Guerra's person while he sat in the patrol car. Guerra, however, had to win that argument in the trial court. We do not engage in our own factual review. *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). We give almost total deference to the trial court's factual findings and its credibility and demeanor evaluations. *Id.* at 861–62. The trial court had evidence supporting its finding that Villarreal was credible.

For example, Villarreal explained that Mitchell suffered from allergies that interfered with Mitchell's sense of smell. Mitchell confirmed that he had allergies, but

22

he could not recall whether they interfered with his sense of smell on the day that he stopped Guerra.

Mitchell acknowledged that he did not smell any marijuana on Guerra while Guerra sat in Mitchell's patrol car. For the trial court's purposes, however, the odor did not necessarily have to come from Guerra to generate probable cause to search the pickup. Villarreal described Sosa as leaning back into the pickup when Villarreal approached the window. A rational factfinder could have reasonably inferred that Sosa was aware that his clothing emitted a marijuana odor—i.e., regardless of whether Guerra emitted the odor of marijuana, Sosa did.

Moreover, the evidence showed that Villarreal placed his face inside the window, whereas Mitchell's face approached the window but did not penetrate it. Because of the emphasis placed on Villarreal's sticking his face inside the cab, a rational factfinder might have reasonably concluded that Villarreal had a better opportunity to smell the interior of the cab. These are factual issues that the factfinder must resolve. In this instance, the trial court resolved them in the State's favor.

The evidence lends itself to many conflicting inferences. Ultimately, the trial court believed Villarreal. We defer to the trial court's factual findings. *See Wiede*, 214 S.W.3d at 24–25.

We hold that the trial court did not err by concluding that the investigation was not unreasonably long and that probable cause existed to search Guerra's vehicle. *See Sheppard*, 271 S.W.3d at 291. We overrule Guerra's first point.

## III. LEGALIZATION OF HEMP AND RELATED PRODUCTS

In Guerra's second point, he contends that by denying his motion to suppress, the trial court erred because the Texas legislature had made hemp and other cannabis products legal, so "the officers had no way to determine or distinguish whether the odor they may have detected was of a legal or illegal substance." We disagree.

Guerra appears to rely on the 2019 enactment of H.B. 1325 to contend that the deputies could not search his pickup based on an odor of marijuana emanating from it.[7] *See* Act of May 22, 2019, 86th Leg., R.S., ch. 764, §§ 2, 13, secs. 121.001–.004

---

[7]The El Paso Court of Appeals deftly summarized H.B. 1325 as follows:

The stated intent of House Bill 1325 was to regulate the newly legalized hemp industry. *See* Tex. Agric. Code Ann. § 121.002. To that end, the legislature added two new chapters to the Texas Agricultural Code which created a detailed network of regulatory provisions, imposing licensing requirements for those growing hemp, specifying various rules pertaining to the cultivation, harvesting and transportation of hemp, and imposing both criminal and civil penalties for violations of those regulations. *Id.* §§ 121.001–121.004, 122.001–122.404.

Because marijuana is still illegal in Texas, and since both marijuana and hemp are cultivated from the same plant, the legislature found it necessary to draw a distinction between the two substances. The legislature did so by adding the following definition of "hemp" to the Agricultural Code, defining it as: "[T]he plant Cannabis sativa L. and any part of that plant, including the seeds of the plant and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether

24

(current version at Tex. Agric. Code §§ 121.001–.004). The legalization of hemp in Texas to which Guerra refers did not take effect until June 10, 2019. *See id.*; *Sanchez v. State*, No. 07-19-00337-CR, 2021 WL 2673061, at *2 (Tex. App.—Amarillo June 29, 2021, pet. ref'd) (per curiam) (mem. op., not designated for publication). Guerra's traffic stop took place on May 8, 2019. Unless H.B. 1325 applies retroactively, Guerra's argument fails.

"A statute is presumed to be prospective in its operation unless expressly made retrospective." Tex. Gov't Code Ann. § 311.022. Although not addressed by this court or the Texas Court of Criminal Appeals, other courts have ruled that H.B. 1325 does not apply retroactively. *See Sanchez*, 2021 WL 2673061, at *2 (noting that sister courts of appeals had consistently rejected the argument that H.B. 1325 should apply retroactively); *Smith v. State*, 620 S.W.3d 445, 453 (Tex. App.—Dallas 2020, no pet.) ("[W]e conclude the changes enacted by the Legislature in H.B. 1325 apply prospectively to offenses committed after the date it took effect, June 10, 2019 . . . ."); *Geberkidan v. State*, No. 12-19-00296-CR, 2020 WL 5406243, at *6 (Tex. App.—Tyler Sept. 9, 2020, pet. ref'd) (mem. op., not designated for publication) (stating that the court did not need to determine whether hemp and marijuana had the same odor because the March 6, 2018 search predated H.B. 1325's June 10, 2019 effective date);

---

growing or not, with a delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis." *Id.* § 121.001.

*Arellano v. State*, No. 08-19-00240-CR, 2021 WL 2678482, at *3 (Tex. App.—El Paso June 30, 2021, no pet.) (not designated for publication).

*Gaffney v. State*, No. 06-19-00189-CR, 2020 WL 465280, at *2 n.4 (Tex. App.—Texarkana Jan. 29, 2020, no pet.) (mem. op., not designated for publication) (holding that H.B. 1325 did not apply because the offense occurred before H.B. 1325's effective date). We agree. Guerra has not pointed to anything in the statute that suggests that the legislature intended it to be retroactive. *See* Tex. Gov't Code Ann. § 311.022.

In Guerra's reply brief, he concedes that he was arrested before the effective date of H.B. 1325. Despite that, Guerra presses on with his argument:

> However, the rationale for equating the smell of marijuana with illegal activity expired long before that date. Appellant was arrested after the passage of the federal Farm Bill in 2018, and the passage of laws allowing for the use of marijuana for medical purposes and recreational purposes in 23 other states, like Oregon, beginning in the early 2000's. . . . Given that, the smell of what might be marijuana (or might be smokable hemp) might not be evidence of crime occurring in Texas, but evidence that Sosa had engaged in legal activity in another state and traveled into Texas. The basis for treating the odor of marijuana as sufficient probable cause for a search has been that the odor was always indicative of criminal activity. That has not been the case for many years now. The courts must rethink their approach to this issue.

*See Gaffney*, 2020 WL 465280, at *2 n.4 ("Because of the similarities in the definitions of marihuana and hemp, the continued viability of the holding that officers and lay witnesses may identify marihuana through their senses alone may be in question."); *but cf. Isaac v. State*, No. 04-22-00203-CR, 2023 WL 5249619, at *2 (Tex. App.—San Antonio Aug. 16, 2023, no pet. h.) ("[W]e conclude that the odor of marijuana, as well as its appearance, can at least be part of the totality of the evidence supporting

26

probable cause to investigate."); *Cortez v. State*, No. 05-21-00664-CR, 2022 WL 17817963, at *7 (Tex. App.—Dallas Dec. 20, 2022, pet. filed) (mem. op., not designated for publication) ("[Appellant] argues that because marijuana and hemp come from the same plant, . . . the odor . . . is insufficient by itself to establish probable cause to search. But the possession of marijuana is still a criminal offense[,] . . . and a reasonable, even if ultimately erroneous[,] conclusion . . . would be permitted under the Fourth Amendment."). The legality of marijuana in other jurisdictions does not help Guerra. Marijuana remains illegal here. *See Dowden v. State*, 455 S.W.3d 252, 256 (Tex. App.—Fort Worth 2015, no pet.). Because we rely on Texas law and because Texas law on this point is settled—at least for the time when Guerra committed his offense—we decline Guerra's invitation to revisit the issue.[8]

We hold that the trial court did not err by not denying the motion to suppress on this basis. *See Sheppard*, 271 S.W.3d at 291. We overrule Guerra's second point.

---

[8]We would also note that the record reflects that when stopped, Guerra represented to Mitchell that he and Sosa were travelling from Pasadena to Amarillo. We take judicial notice that a Pasadena-to-Amarillo nonstop intrastate drive is almost 400 miles long and—assuming no stops in between—would take over six hours to complete. *See* Tex. R. Evid. 201(b)(2); Trippy, https://www.trippy.com/distance/ Wichita-Falls-to-Pasadena-TX (last visited Sept. 29, 2023). Under the circumstances, the trial court was within its discretion to find that the extant odor detected by Villarreal had as its source a joint smoked sometime after leaving Pasadena.

27

## IV. CONCLUSION

Having overruled Guerra's two points, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  October 5, 2023